**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**PHILIP DEAN BARNETT,**

        **Plaintiff,**

**v.**                                                      **Case No.: 3:10-cv-1316**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

        **Defendant.**

**MEMORANDUM OPINION**

This is an action seeking review of the decision of the Commissioner of Social Security (hereinafter the "Commissioner") denying Claimant's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401-433. (Docket No. 2). Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 11 and 12). The case is presently pending before the Court on the parties' cross motions for judgment on the pleadings as articulated in their briefs. (Docket Nos. 10 and 15).

The Court has fully considered the evidence and the arguments of counsel. For the reasons set forth below, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I.   Procedural History

Plaintiff, Philip Dean Barnett (hereinafter "Claimant), filed an application for DIB benefits on August 15, 2007, alleging a disability onset date of September 30, 2006

1

due to diabetes, high blood pressure, high cholesterol, right wrist pain, depression, and anxiety. (Tr. at 111–15, 125). The Social Security Administration (hereinafter "SSA") denied the application initially on September 4, 2007 and again on reconsideration. (Tr. at 61–70). Thereafter, Claimant requested a hearing before an administrative law judge (hereinafter "ALJ"). (Tr. at 71–76). The Honorable Andrew J. Chwalibog, ALJ, presided over Claimant's hearing on March 1, 2010. (Tr. at 24–48). The ALJ denied Claimant's application by decision dated March 30, 2010. (Tr. at 8–23). The ALJ's decision became the final decision of the Commissioner on September 17, 2010 when the Appeals Council denied Claimant's request for review. (Tr. at 1–5). Claimant timely filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. §405(g). (Docket No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties filed their Briefs in Support of Judgment on the Pleadings. (Docket Nos. 7, 8, 10, and 15). Consequently, the matter is ripe for resolution.

## II.    <u>**Summary of ALJ's Decision**</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. See *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently

2

engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. (the "'Listing") *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the next step is to ascertain whether the claimant's impairment prevents the performance of past relevant work. *Id.* § 404.1520(f). If the impairment does prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868–69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review." 20 C.F.R. § 404.1520a. First, the

SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). That section provides as follows:

c) *Rating the degree of functional limitation*.

(1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listing of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

4

Third, after rating the degree of functional limitation from the claimant's impairment, the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1).

Next, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. § 404.1520a(d)(3). The regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusion based on the technique. The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(2).

In the present case, at the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since September 30, 2006,

the date of the alleged onset of disability. (Tr. at 13, Finding No. 2). Turning to the second step of the evaluation, the ALJ determined that Claimant's diabetes mellitus was a severe impairment. (Tr. at 13, Finding No. 3). The ALJ further concluded that Claimant's high blood pressure, high cholesterol, right wrist pain, depression, and anxiety were not severe impairments. (Tr. at 13–15, Finding No. 3). Under the third inquiry, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments detailed in the Listing. (Tr. at 15, Finding No. 4). Accordingly, the ALJ assessed Claimant's RFC, finding: "[C]laimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c). He can occasionally climb and needs to avoid concentrated exposure to temperature extremes and hazards." (Tr. at 16, Finding No. 5). The ALJ then analyzed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 18–19, Finding No. 6). The ALJ considered that (1) Claimant was able to perform past relevant work; (2) he was born on October 2, 1957, and at age 48, was defined as a younger individual age 18–49 on the alleged disability onset date (20 CFR 404.1563); (3) he had a high school education and could communicate in English; and (4) transferability of job skills was not material to the disability determination because Claimant's past relevant work was unskilled. (Tr. at 18). Although Claimant was capable of performing past relevant work, the ALJ consulted with a vocation expert to determine the availability of other occupations in the national and regional economy that Claimant could do. Based on the testimony of a vocational expert, the ALJ found that Claimant could make a successful adjustment to employment positions that existed in significant numbers in the national economy, such as a product packer, cleaner, night guard, office

6

helper, surveillance monitor, and product inspector. (Tr. at 18–19). Therefore, the ALJ concluded that Claimant was not disabled and, thus, was not entitled to benefits. (Tr. at 19, Finding No. 7).

### III.   Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650, 653 (4th Cir. 2005), citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001). If substantial evidence exists, then the Court must affirm the decision of the Commissioner "even should the court disagree with such decision." *Blalock,* 483 F.2d at 775. Applying this legal framework, a careful review of the record reveals that the decision of the Commissioner is based upon an accurate application of the law and is supported by substantial evidence.

IV.   **Claimant's Background**

Claimant was 48 years old at the time of his alleged disability onset, 49 years old when he filed his application for benefits, and 52 years old at the time of his administrative hearing. Claimant had previous experience working as a store clerk, security guard, and corrections officer. (Tr. at 126, 130). Claimant had an 11th grade education and was proficient in English.

V.   **Relevant Evidence**

The Court has reviewed the Transcript of Proceedings in its entirety, including the medical records in evidence, and summarizes below Claimant's medical treatment and evaluations to the extent that they are relevant to the issues in dispute or provide a clearer understanding of Claimant's medical background.

A.   **Treatment Records**

1.   ***Prior to Disability Onset Date***

On September 20, 2004, Claimant presented to the Veterans Administration Medical Center (VAMC) in Huntington, West Virginia for the purpose of establishing primary care at the facility. (Tr. at 522–25). Beverly Roby, RN, conducted a preliminary interview of Claimant regarding his social and medical history and lifestyle. She then performed some initial screening examinations. (Tr. at 525–27). An alcohol screening test was positive, indicating that Claimant was at risk for alcohol abuse. (Tr. at 527). In addition, Claimant had multiple risk factors for Hepatitis C. (*Id.*). Claimant's screenings for post traumatic stress disorder (PTSD) and nutritional deficits were negative. (*Id.*). Claimant reported that he was feeling "okay" and denied suffering from headaches, blurred vision, dizziness, nausea, vomiting, chest pain, hematuria or any other complaints. (Tr. at 522). Although Claimant stated that he had been diagnosed with

hypertension in the past, he indicated that he had not been taking his prescribed medication. (*Id.*). Claimant's blood pressure was measured as 176/98. (Tr. at 524). After Ms. Roby concluded her interview, Claimant was examined by the attending physician. Based upon the results of his examination, the attending physician developed a treatment plan for Claimant, which included Claimant taking felodipine daily to lower his blood pressure, exercising and losing weight, restricting salt intake, and performing routine blood pressure measurements. (*Id.*). Screening laboratory tests were ordered, which subsequently returned with positive results for Hepatitis C, high cholesterol, and hypertension. (Tr. at 431-33, 519).

On November 17, 2004, Claimant returned to the VAMC for a gastroenterology consultation with Jeremiah Donovan, MD. (Tr. at 517). Dr. Donovan ordered a PCR test for the presence of Hepatitis C virus, which was negative. Accordingly, Dr. Donovan concluded that Claimant's initial lab result was either a false positive or Claimant had contracted Hepatitis C in the past, but had "cleared [the] virus." (*Id.*). Dr. Donovan noted that Claimant's blood pressure remained high at 159/94, so he increased Claimant's prescription of felodipine to 15 mg a day. (Tr. at 517-18).

Claimant returned to the VAMC for a follow-up appointment with a primary care physician, Farhan Ahmed, MD, on November 29, 2004. (Tr. at 513–15). Claimant was first interviewed and assessed by Nurse Roby, who recorded Claimant's blood pressure as 131/78. (Tr. at 515-16). Claimant stated that his blood pressure had not been that low since he had started measuring it on a daily basis two weeks earlier. (*Id.*). Claimant reported that his blood pressure measurements usually ranged between 150-170/90-105. (Tr. at 513). Claimant was then examined by Dr. Ahmed. Dr. Ahmed documented Claimant's complaint of his feet swelling throughout the week prior to his appointment

and indicated that Claimant was prescribed a Beta Blocker to alleviate his hypertension and the related symptoms. (Tr. at 513-155).

On February 7, 2005, a x-ray of Claimant's chest was taken at the VAMC and reviewed by George Wilson, MD. (Tr. at 407). Although Dr. Wilson noted a mild asymmetric elevation of the anterior aspect of the right hemidiaphragm, he found no significant abnormalities in Claimant's heart or lungs. (*Id.*). That same day, Claimant was scheduled for a routine follow-up visit with Dr. Ahmed. (Tr. at 509–13). Claimant was first evaluated by Edwina Kay Bowman, LPN. (Tr. at 511–13). Claimant told Nurse Bowman that he was still experiencing swelling in his feet and ankles and that his blood pressure remained high. Claimant's blood pressure was taken and measured 142/90. (Tr. at 510-12). Claimant also reported to Dr. Ahmed that his blood pressure was running consistently high and stayed in the range of 150-170/90-100. (Tr. at 509). No changes were made to Claimant's medication regimen at that time. On February 25, 2005, Claimant was admitted to the emergency room at the VAMC with complaints of a persistent hypertension and ankle edema. (Tr. at 505–06). Claimant advised that his blood pressure regularly measured around 170/90. (Tr. at 506). Claimant reported no other acute problems and denied using alcohol. (*Id.*).

On March 15, 2005, Claimant returned to the VAMC for a follow-up appointment regarding his hypertension. (Tr. at 501–04). Claimant was seen first by Nurse Roby and told her that he had been taking his medications as prescribed, but that his blood pressure still remained elevated. (Tr. at 502). Claimant confirmed that his ankles, on the other hand, were less swollen than they had been in prior months. (Tr. at 502). Dr. Mehdi Chowdhury examined Claimant and discussed a proposed treatment plan with him. (Tr. at 501–02). Dr. Chowdhury recommended that Claimant continue taking

10

felodipine, metroprolol (a Beta Blocker), and hydrochlorothiazide (a water pill) to treat his hypertension. (Tr. at 501).

On April 12, 2005, Claimant visited the VAMC for an appointment at the hypertension clinic. (Tr. at 497–99). Rebecca Ann Hensley, LPN, assessed Claimant and recorded his medical history. (Tr. at 496–97). Claimant reported hypertension and bilateral leg swelling. (Tr. at 496). Ms. Hensley conducted a functional and nutritional assessment of Claimant and provided basic education on exercise and weight control. (Tr. at 496–97). Christopher M. Degenkolb, Pharmacist, then reviewed Claimant's list of medications and discussed treatment goals. (Tr. at 498–99). Mr. Degenkolb recorded Claimant's diet and exercise routines, noting that Claimant drank several cans of soda daily; did not cook with salt; worked as a security guard; walked "a lot" during the day; and regularly mowed his lawn. (Tr. at 498). For Claimant's treatment goals, Mr. Degenkolb set a target blood pressure measurement of less than 140/90. (Tr. at 499). Claimant mentioned ongoing bilateral leg edema, which Mr. Degenkolb believed was a side effect of felodipine. (*Id.*). Consequently, Mr. Degenkolb discontinued Claimant's felodipine prescription and prescribed lisinopril instead. (*Id.*). On April 28, 2005, Claimant called the pharmacy at VAMC and reported concerns that his blood pressure was not as well controlled under the lisinopril as it was under the felodipine, but acknowledged that his leg and ankle edema had dissipated. (Tr. at 500).

On May 16, 2005, Claimant returned to the VAMC for a diabetic consult.[1] (Tr. at 487–95). Claimant was first assessed by Nurse Hensley, (Tr. at 487–90). Ms. Hensley explained to Claimant the proper usage of Accuchek Advantage, his new blood sugar

---

[1] A health care record verifying Claimant's original diagnosis of diabetes was not in evidence.

monitor. (Tr. at 488). Claimant was provided information regarding how to treat his diabetes and the necessary self-care he would need to perform. (Tr. at 489–91). A diabetic foot examination was performed and the results were normal. Ramona C. Anderson, a certified dietitian, met with Claimant and provided him with initial diabetes diet instruction. (Tr. at 491–92). Claimant reported some blurred vision but no other symptoms associated with diabetes. (Tr. at 491). Claimant stated that he worked evening shifts as a security guard, ate two meals daily, and was on medications for hypertension. (*Id.*). Claimant was then examined by Julia Ewen, MD. (Tr. at 492–95). Dr. Ewen noted that Claimant complained of having consistently elevated blood pressure readings and of experiencing muscle cramps since he began taking hydrochlorothiazide ("HCTZ"). (Tr. at 493). To treat Claimant's diabetes, Dr. Ewen prescribed low dose metformin. (Tr. at 495).

On June 7, 2005, Claimant was admitted to the emergency room at the VAMC, complaining that his blood pressure was uncontrollable. (Tr. at 484–86). Samson Teka, MD, conducted a physical exam of Claimant that revealed no systemic abnormalities. (485–86). Claimant was subsequently discharged in stable condition. (Tr. at 485). On June 13, 2005, Claimant returned to the VAMC for a follow-up appointment with the certified dietitian, Ms. Anderson. (Tr. at 479–80). Claimant reported that he changed to drinking diet soft drinks and had begun reading labels for carbohydrate content. (Tr. at 479). Ms. Anderson noted that Claimant had lost seven pounds in one month and emphasized the importance of Claimant continuing to lose weight. (Tr. at 480). Claimant was subsequently examined by Dr. Ahmed. (Tr. at 481–83). Dr. Ahmed measured Claimant's blood pressure as 175/95 and documented Claimant's complaint that his blood pressure remained high. Several days later, on June 15, 2005, Claimant

returned to the VAMC for an optometry consultation with Donald Seibert, OD. (Tr at 426–27). Dr. Seibert found no evidence of diabetic retinopathy and determined that no treatment was required at that time. (*Id.*). On June 28, 2005, Claimant returned to the VAMC for a follow-up appointment with Dr. Chowdhury. (Tr. at 472–77). Mary Runyon, LPN, conducted a nursing intake assessment of Claimant, which was negative for depression and PTSD. (Tr. at 476). Ms. Runyon recorded Claimant's blood pressure as 158/95. (Tr. at 475). Claimant's alcohol screening was negative. (*Id.*). Dr. Chowdhury noted Claimant's complaints of high blood pressure and prescribed an increase in Claimant's daily intake of HCTZ. (Tr. at 474–473).

On January 3, 2006, Claimant returned to the VAMC for a follow-up appointment with Dr. Chowdhury. (Tr. at 253–58). Nurse Runyon conducted an initial assessment of Claimant and recorded Claimant's complaints of sleeplessness at night and continuing problems with hypertension. (Tr. at 257). Claimant's blood pressure was measured as 120/78. (Tr. at 253). Dr. Chowdhury noted that this measurement, along with the measurements recorded in Claimant's blood pressure log, were all in the "satisfactory range." (Tr. at 253). To address Claimant's complaints of sleeplessness, Dr. Chowdhury prescribed an anti-depressant, trazodone. (Tr. at 255).

### 2.    *Relevant Time Period*

On October 2, 2006, Claimant returned to the VAMC for a follow-up appointment. (Tr. at 245–52). Judy Carol Adams, LPN, conducted an initial assessment of Claimant. (Tr. at 250–52). Claimant's blood pressure was measured as 121/88 and 127/78. (Tr. at 250). Ms. Adams noted that Claimant complained of a burning sensation in his feet. (*Id.*). Claimant's alcohol screening was negative for alcohol abuse, but his BMI measurement classified him as overweight. (Tr. at 252). The results of Claimant's

diabetic foot exam indicated that Claimant retained normal foot sensations and pulses. (*Id.*). Claimant reiterated his complaints of a burning sensation in his feet and blood in his stools to Dr. Chowdhury. (Tr. at 245). Dr. Chowdhury documented that Claimant's hypertension was adequately controlled by medication. (Tr. at 247). Claimant's depression screening was negative. (Tr. at 248). On October 25, 2006, a x-ray of Claimant's chest was taken at the VAMC. (Tr. at 207). Claimant's heart and pulmonary system contained no evidence of acute disease and no significant change from Claimant's chest x-ray from February 2005. (*Id.*). Following his chest x-ray, Claimant was examined by Dr. Chowdhury and Ms. Adams. (Tr. at 237–39). Claimant informed them that he was now residing at the West Virginia Veterans Home. Dr. Chowdhury noted Claimant's history of hypertension and found no significant changes in his health. (*Id.*).

On December 15, 2006, James G. Allman performed a pharmacotherapy review[2] of Claimant's prescriptions at the VAMC. (Tr. at 225–26). At this appointment, Claimant's blood pressure was measured as 116/61. (Tr. at 225). Mr. Allman continued Claimant's prescriptions because they effectively controlled Claimant's blood pressure and diabetes. (Tr. at 226). On January 15, 2007, Mr. Allman conducted another pharmacotherapy review of Claimant's medications and made no changes to Claimant's prescriptions. (Tr. at 223–25). On March 11, 2007, Anna M. Connolly, a pharmacy resident, and Mr. Allman together conducted a pharmacotherapy review of Claimant's prescriptions. (Tr. at 221–23). Ms. Connolly and Mr. Allman noted that Claimant's diabetes and hypertension were "well controlled" by his existing medication. (Tr. at

---

[2] Pharamacotherapy reviews were conducted bi-monthly pursuant to the West Virginia Veterans Home protocol. (Tr. at 225).

223). They further noted that Claimant's cholesterol levels were slightly elevated and recommended considering the addition of Lovastatin to address this issue. (*Id.*).

On April 18, 2007, Claimant returned to the VAMC with complaints of a burning and tingling sensation in his feet. (Tr. at 217–21). Dr. Chowdhury prescribed no new medications and emphasized the continued importance of managing fat and cholesterol intake, exercising more, and losing weight. (Tr. at 218–19). In addition, Dr. Chowdhury encouraged Claimant to quit the use of chewing tobacco. (Tr. at 219). Based on concerns over Claimant's cholesterol, Dr. Chowdhury recommended that Claimant schedule an appointment at the VAMC's lipid clinic. (Tr. at 218). On May 14, 2007, a pharmacotherapy review of Claimant's medication was conducted by Tiffany Johnson, Pharmacist. (Tr. at 215–16). Claimant's blood pressure was measured to be 110/70. (Tr. at 216). Ms. Johnson noted that Claimant had started taking Lovastatin to control his cholesterol and otherwise recommended no changes in Claimant's medications. (*Id.*).

On June 11, 2007, Claimant returned to the VAMC for an appointment at the lipid clinic with Sharon Kennedy-Norris, Pharmacist. (Tr. at 213–15). Claimant reported that he walked daily and had a limited diet because of living at the Veterans Home. (Tr. at 214). Claimant denied using tobacco and stated that he drank beer "sometimes." (*Id.*). Ms. Kennedy-Norris noted that Claimant suffered from hypertension, diabetes, and elevated lipid levels. (*Id.*). She set out a treatment plan, recommending that Claimant continue his diet modification plan; continue exercising and losing weight; and continue medication therapy with Lovastatin. (Tr. at 215). On July 18, 2007, a pharmacotherapy review of Claimant's medication was conducted by Derek L. Grimm, Pharmacist. (Tr. at 212–13). Claimant's blood pressure was measured at 110/70. (Tr. at 212). Mr. Grimm

had no medication recommendations upon review of Claimant's prescriptions. (Tr. at 213).

On August 7, 2007, Claimant met with Frances F. Burgess, MA, a vocational rehabilitation specialist at the VAMC. (Tr. at 211). Claimant requested vocational assistance and expressed a desire to return to the workforce. (*Id.*). Ms. Burgess noted that Claimant had no mental health diagnosis, no physical disability, and did not collect Veteran Non-Service or Veteran Service Connected benefits. (*Id.*). Claimant reported that he had been employed for 21 years in Central Stores at St. Mary's Medical Center, but lost his position after being charged with falsifying his time records. (*Id.*). Following his dismissal, Claimant was employed as a security guard at the West Virginia Veterans Home. (*Id.*). Claimant reported working at the Veterans Home for three years before going to work as a correctional officer at the Western Regional Jail in Barboursville, West Virginia. (*Id.*). According to Claimant, he had to stop working at the Jail because of complications with his diabetes; specifically, painful swelling of his feet. (Tr. at 211). Claimant reported being unemployed since September 2006. (*Id.*). After meeting with a Workforce Investment Act (WIA) representative, Claimant was informed that he qualified for truck driver training. (*Id.*). However, Claimant did not pursue the training because of "family issues" at the time. (*Id.*). Ms. Burgess provided Claimant with information regarding Workforce West Virginia resources and encouraged Claimant to establish a relationship with a Workforce West Virginia Veterans' representative. (*Id.*). Claimant expressed interest in applying for positions at the VAMC. (*Id.*). Ms. Burgess supplied Claimant with an application and declaration for federal employment and counseled Claimant on how to apply for federal employment using USA Jobs. (Tr. at 211).

On August 27, 2007, Claimant returned to the VAMC as a walk-in patient to the mental health clinic. (Tr. at 305–07). Patty J. Hill, LSW, evaluated Claimant. Claimant stated that he was "just depressed" because of the loss of his job, loss of his wife, loss of his dog, chronic medical issues, and two sons facing murder charges. (Tr. at 305). After separating from his second wife in 1995, Claimant's trailer home was repossessed. (*Id.*). Claimant reported suffering from depression since 2002 when he lost his job at St. Mary's Medical Center. (*Id.*). He stated that he suffered from a frequently depressed mood, anhedonia, sleep problems, loss of energy/fatigue, and trouble with concentration. (*Id.*). When Ms. Hill questioned Claimant regarding any previous suicidal ideation, he admitted that suicide "has crossed my mind[,]" but "I am not going to kill myself." (*Id.*). Ms. Hill described Claimant's affect as sad and agitated and noted Claimant complained of increased irritability. (Tr. at 306). After completing the interview, Ms. Hill diagnosed Claimant as suffering from Major Depressive Disorder and scheduled a general mental health intake for him at the VAMC. (Tr. at 307). Claimant expressed interest in psychotherapy and medication evaluation. (*Id.*).

On September 12, 2007, Claimant returned to the VAMC for a comprehensive mental health evaluation with Leann Bills, LSW. (Tr. at 297–303). Claimant's chief complaints were of depression and irritability. (Tr. at 297). Ms. Bills recorded Claimant's history of depression, which mirrored the history set forth by Ms. Hill. Claimant stated that for the past several years he averaged about three hours of sleep per night and ate one to two meals per day as he had lost his appetite. (Tr. at 298). Claimant also expressed that he lost interest in activities he previously enjoyed, including hunting, fishing, and car racing. (*Id.*). In addition, Claimant reported that he felt worthless and had daily thoughts about suicide, although he had no present

17

intention or plan to commit suicide. (*Id.*). Explaining that he was very easily irritated, Claimant stated that he hit a wall a month prior to his evaluation and was verbally aggressive with others about three to four times a week. (*Id.*). Ms. Bills noted that Claimant was very upset and stressed because of his concern over the murder charges pending against his two sons. (*Id.*). Claimant reported playing with his grandchildren as his sole leisure activity and did not express interest in a referral for recreational therapy. (Tr. at 298). Claimant also declined a referral to a work training program or vocational rehabilitation. (Tr. at 300).  Claimant informed Ms. Bills that he experienced chronic sharp pain in his right wrist. (Tr. at 299). Ms. Bills noted that Claimant was not currently receiving physical therapy; had sufficient energy for desired daily activities; and did not have a functional impairment or limitation with ambulation. (Tr. at 301). Upon completion of a mental status examination, Ms. Bills found that Claimant was cooperative but irritable during the interview. (Tr. at 301–02). Claimant's thought process, cognitive functions, perception, and intelligence were all within normal limits. (Tr. at 302). Ms. Bills found that Claimant's insight and judgment were poor. (*Id.*). In conclusion, Ms. Bills recommended that Claimant be prescribed appropriate anti-depressant medication. (Tr. at 303). Claimant agreed to take anti-depressants, but refused to participate in mental health therapy. (*Id.*). On September 14, 2007, Claimant met with Mary Wise, ARNP, at the VAMC for another mental health evaluation. (Tr. at 296–97). Ms. Wise discussed Claimant's mental health history and prescribed Celexa to treat his depression. (Tr. at 297).

On October 25, 2007, Claimant was examined by Brian Colander, MD, an ophthalmologist at the VAMC. (Tr. at 286–90). Dr. Colander performed a diabetic retinopathy screening and found no indications of diabetic retinopathy. (Tr. at 289).

After the eye screening, Claimant was seen by Edwina Kay Bowman, LPN, for a general medical assessment. (Tr. at 293–96). Claimant again complained of burning pain in his feet. (Tr. at 293). Ms. Bowman conducted an alcohol screening, which returned positive for potential alcohol abuse. (Tr. at 295). Claimant admitted to drinking four to five beers a day. (*Id.*). Ms. Bowman also performed a diabetic foot examination, noting that Claimant's sensation and pulses were normal despite callusing of his feet. (Tr. at 296). Claimant was then evaluated by Dr. Chowdhury. (Tr. at 290–93). Claimant repeated his complaints of burning pain in both of his feet, which he described as a 7/10 on the numeric pain intensity scale. (*Id*). Claimant reported that the pain in his feet occurred intermittently and had been ongoing for more than three months. (Tr. at 293).  Dr. Chowdhury noted Claimant's blood pressure was measured as 124/83 and was adequately controlled by medication. (Tr. at 290–91). Dr. Chowdhury prescribed Elavil to alleviate Claimant's pain symptoms in his feet and ordered a podiatry examination. (Tr. at 292). On November 9, 2007, Claimant was examined by Ruth Glasseur Jones, a podiatrist at the VAMC. (Tr. at 314–15). Inexplicably, Claimant stated that he did not know why he was sent for a podiatry consult and did not have problems with his feet. (Tr. at 315). Dr. Jones found that Claimant's feet appeared callused but otherwise had normal sensation and pulse. (Tr. at 314). Ultimately, Dr. Jones concluded that Claimant's feet were not "high risk" and that no treatment was needed. (Tr. at 315).

On November 13, 2007, Mark Hall, Pharmacist, completed a pharmacotherapy review of Claimant's medication. (Tr. at 312–14). Claimant's blood pressure was measured as 124/83. (Tr. at 313). Mr. Hall review Claimant's list of medications and made no changes in Claimant's prescriptions. (Tr. at 314).

On May 2, 2008, Claimant returned to the VAMC for a follow-up appointment with Dr. Chowdhury. (Tr. at 467–69). Claimant's blood pressure was measured as 113/71. (Tr. at 467). Dr. Chowdhury again noted that Claimant's hypertension was adequately controlled by medication. (Tr. at 468). Claimant's alcohol screening was positive for possible alcohol abuse, but he declined further evaluation or treatment for alcohol dependency. (*Id.*). On May 11, 2008, no changes were made to Claimant's prescriptions after a pharmacotherapy review at the VAMC. (Tr. at 465–67). On October 27, 2008, Claimant was assessed by Luella C. Gillepsie, CFNP. (Tr. at 457–62). Claimant's blood pressure was measured as 110/76. (Tr. at 457). He reported experiencing difficulty sleeping due to unrelenting pain in his legs at night, which had started several months earlier. (*Id.*). Ms. Gillepsie conducted a diabetic foot exam and found that Claimant's foot was not at risk of any complications related to diabetes. (*Id.*).

On December 8, 2008, Claimant returned to the VAMC for a lipid management consultation with Sharon Kennedy-Norris, Pharmacist. (Tr. at 455–56). Claimant stated that he tried to follow a diet that was low in saturated fat because of his diabetes but that he was not "100% compliant" with that diet. (Tr. at 456). Ms. Kennedy-Norris documented that Claimant's walked on a daily basis for exercise. She emphasized to Claimant the importance of diet and lifestyle modification. (*Id.*). On January 7, 2009, Claimant met with Robin Henderson, Pharmacist, for a follow-up lipid management consultation. (Tr. at 454–55). Ms. Henderson again encouraged lifestyle and diet modification and confirmed that Claimant suffered from hyperlipidemia. (*Id.*). Lipid management progress reports from February and April showed no side effects related to Claimant's cholesterol medication or new-onset symptoms. (Tr. at 451–53). On May 28, 2009, Claimant returned to the VAMC for his regular visit with Dr. Chowdhury. (Tr. at

444–51). Claimant's blood pressure was measured as 92/60. (Tr. at 444). Claimant reported no complaints and requested refills of his medication. (Tr. at 445). Claimant stated that he was not depressed; did not have feelings of hopelessness; and had not thought about harming or killing himself in the past month. (Tr. at 448). Claimant's alcohol screening was negative for alcohol abuse. (Tr. at 449). Wendy Richow, Pharmacist, also consulted with Claimant at his appointment regarding lipid management. (Tr. at 450–51). Claimant's cholesterol was still elevated but had improved with medication. (Tr. at 450). Claimant stated that he would like to try improving his diet before further increasing his cholesterol medication. (*Id.*).

On July 9, 2009, Claimant returned to the VAMC for a follow-up lipid management consultation with Mark Hall, Pharmacist. (Tr. at 443–44). Mr. Hall noted that Claimant reported trying to follow a diabetic diet and walking daily for exercise. (Tr. at 443). On November 10, 2009, Claimant was also assessed at the VAMC by Brian J. Loshbough, CFNP, and Rebecca Ann Hensley, LPN. (Tr. at 435–43). Claimant's blood pressure was recorded as 113/72. (Tr. at 435). An alcohol screening was positive for potential alcohol abuse. (Tr. at 437). Claimant reported being depressed, but did not feel hopeless and had not thought about committing suicide in the past month. (Tr. at 440).

### B.  Agency Assessments

#### 1.  *Physical Health Assessments*

On August 31, 2007, Thomas Lauderman, DO, completed a Physical Residual Functional Capacity Assessment (RFC) at the request of the SSA. (Tr. at 261–68). Dr. Lauderman found that Claimant could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk about six hours a day, sit for six hours a day, and was unlimited in his ability to push or pull. (Tr. at 262). Claimant's postural limitation restricted him to

activities that only occasionally involved balancing. (Tr. at 263). Dr. Louderman found

that Claimant was not subject to any manipulative, visual, or communicative limitations.

(Tr. at 264–65). Claimant's environmental limitations required him to avoid

concentrated exposure to extreme heat, extreme cold, and hazards, such as machinery

and heights. (Tr. at 265). Dr. Louderman recorded Claimant's complaints as follows:

> The claimant reports daily pain his legs, feet, and right wrist. Walking and
> standing aggravate his pain and rest and meds sometimes help.
>
> He indicates difficulty lifting (about 30 lbs. max), squatting, bending,
> standing, walking (1/3 mile before needing 15 minutes of rest), stair
> climbing, seeing (he does not use prescribed glasses/contact lenses),
> hearing care tasks. He does laundry weekly and it takes an hour. He says
> he tires easily and his blood pressure goes up with exertion. Clmt. is
> partially credible [sic] since themedical [sic] evidence does not
> substantiate the clmt's allegationst [sic] to the degree alleged.

(Tr. at 268).

On December 12, 2007, Rogelio Lim, MD, completed a RFC assessment at the

request of the SSA. (Tr. at 316–23). Dr. Lim found that Claimant could occasionally lift

50 pounds, frequently lift 25 pounds, stand or walk about six hours a day, sit for six

hours a day, and was unlimited in his ability to push or pull. (Tr. at 317). Claimant's

postural limitation restricted him to activities that required only occasionally climbing

ramps, stairs, ladders, ropes, or scaffolds. (Tr. at 318). Dr. Lim found that Claimant was

not subject to any manipulative, visual, or communicative limitations. (Tr. at 319–20).

Claimant's environmental limitation required him to avoid concentrated exposure to

extreme cold. (Tr. at 320). On a daily basis, Claimant watched television, performed

personal care, drove, did laundry, and went outside three to four times a day. (Tr. at

323). Claimant reported difficulty standing, walking, climbing stairs, and problems with

his vision and hearing. (*Id.*). However, Dr. Lim found that Claimant's allegations were

22

not fully credible. (*Id.*). Dr. Lim noted that Claimant's diabetes and hypertension did not result in any organ damage and Claimant's daily activities were normal for someone capable of performing substantial gainful activity. (*Id.*). With respect to Claimant's wrist pain, Dr. Lim observed that Claimant retained full range of motion. (*Id.*).

On January 14, 2008, Nisha Singh, MD, completed a Medical Consultants Review of Physical Residual Functional Capacity Assessment at the request of the SSA. (Tr. at 350–52). Based on the available evidence, Dr. Singh agreed with the exertional, postural, manipulative, visual, communicative, and environmental limitations proposed by Dr. Lim. (Tr. at 350). Dr. Singh noted that Claimant reported being unable to walk or stand because of swelling in his feet, pain in his right wrist, and painful swelling of the legs at the end of each day. (Tr. at 352). Claimant further stated that he could not run because of shortness of breath. (*Id.*). Dr. Singh noted that Claimant's medical records indicated minimal swelling of the feet and included no mention of pain in Claimant's right wrist. (*Id.*). After reviewing the evidence, Dr. Singh agreed with the severity and limitations proposed by Dr. Lim and found that Claimant was not disabled and capable of performing substantial gainful activity. (Tr. at 351–52).

### 2.    *Mental Health Assessments*

On August 31, 2007, Frank Roman, Ed.D, completed a Psychiatric Review Technique (PRT) at the request of the SSA. (Tr. at 269–82). Dr. Roman noted that Claimant checked on his elderly parents and disabled brother when possible, performed personal care tasks; did laundry once a week for an hour; went outside three to four times per day; watched television; and talked on the phone with relatives daily. (Tr. at 281). Claimant reported depression, anxiety, and difficulty handling stress. (*Id.*). Based on Claimant's medical records and his examination of Claimant, Dr. Roman found that

Claimant was credible, but did not suffer from a significant impairment and was capable of engaging in substantial gainful activity. (*Id.*).

On December 19, 2007, David E. Frederick, Ph.D, performed a mental status examination of Claimant at Argus Psychological Services. (Tr. at 325–27). Claimant reported experiencing thoughts of suicide, depression, and anxiety that left him feeling sick and tired all the time because he could not sleep. (Tr. at 325). Claimant stated that his symptoms of depression and anxiety began five years prior when he lost his job at St. Mary's Medical Center. (Tr. at 325). Dr. Frederick recorded a detailed version of Claimant's complaints:

> [Claimant] said he has broken things, dented things about 10 times in the past year, but has not hurt anyone so as to avoid getting thrown out of the Veterans Home. He said he can control his anger by staying by himself to avoid conflict. His explosive behavior has never cost him a job.
> He reported and described symptoms of major depressive disorder: he said he feels depressed "every day . . . pretty much all day" for "years," and has never been depression-free for "more than a day or so here and there." He said he is "not interested in anything (activities)." He feels worthless, "I'm just existing." He feels easily worn-out, and has early- and mid-phase insomnia.
> Has panicky feeling around others at the Veterans Home, believing they are talking about him.
> He worries about "stuff, Mom, sons." Concerning his worries, he said, "I try to forget them, get them out of my mind."

(Tr. at 327). On examination, Dr. Frederick found Claimant's intellectual functioning to be in the borderline range and his judgment to be moderately deficient. (*Id.*). Dr. Frederick noted that Claimant's attitude, perception, memory, and concentration were all within normal limits. (Tr. at 326). He diagnosed Claimant as suffering from a moderate, single episode of Major Depressive Disorder, borderline intellectual functioning, hypertension, high cholesterol, and diabetes. (*Id.*). Dr. Frederick observed that Claimant's daily activities were "mildly deficient." (*Id.*). Claimant reported normally

24

getting up around 9:30 A.M., taking his medication, and watching television. (*Id.*). When he could afford to, he would visit his mother and his two sons. (*Id.*). In the evenings, Claimant watched television or lay on his bed. (Tr. at 327). He reported doing his own laundry and maintaining his own room. (*Id.*). Dr. Frederick found Claimant's prognosis to be "mentally fair." (*Id.*).

On December 12, 2007, John Todd, Ph.D, completed a PRT at the request of the SSA. (Tr. at 328–41). Dr. Todd found that Claimant suffered from a moderate, single episode of Major Depressive Disorder. (Tr. at 331). Dr. Todd evaluated Claimant's functional limitations and found that Claimant had: (1) mild restriction of activities of daily living; (2) mild difficulties in maintaining social functioning; (3) no difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. at 338). Claimant reported suffering from depression and anxiety and stated that he had so many physical health issues that he had thought about suicide. (Tr. at 340). Dr. Todd concluded that Claimant was mostly credible and that his mental abilities were all within normal limits. (*Id.*). Dr. Todd recorded Claimant's list of daily activities, including performing personal care; driving; doing the laundry; managing his finances; watching television; and interacting with staff and family. (*Id.*). Claimant expressed that his problems functioning were mostly related to his physical health issues and not his mental health. (*Id.*). Dr. Todd concluded that there was "no evidence of significant limitations due to a" mental disorder. (*Id.*). Therefore, he found that Claimant's mental impairment was non-severe. (*Id.*).

### 3.   *Determination by the Department of Veterans Affairs*

On June 5, 2008, the Department of Veterans Affairs ("VA") issued a written decision in which it determined that Claimant was entitled to a nonservice-connected

disability pension. (Tr. at 368-369). The decision clarified that although Claimant did not meet the schedular disability rating requirements of either a single disability or combined disabilities, he was awarded extraschedular benefits based upon the extent of his major depressive disorder, Type II diabetes mellitus, and hypertension in combination with his age, education and occupational background. (*Id.*). According to the written decision, the Department relied upon treatment records supplied by the VAMC, which reflected Claimant's treatment between August 27, 2007 and May 28, 2008.

## VI.    Claimant's Challenges to the Commissioner's Decision

Claimant contends that the Commissioner's decision is not supported by substantial evidence because: (1) the ALJ failed to properly consider the VA's June 5, 2008 decision that found Claimant to be disabled; (2) the ALJ erred in considering only evidence that supported his ultimate conclusion that Claimant was not disabled; (3) the ALJ improperly found Claimant's blood pressure and depression to be nonsevere impairments; and (4) the ALJ failed to discuss the factors set out in SSR 96-7p in determining Claimant's credibility. (Pl.'s Br. at 10–14).

## VII.   Analysis

Having thoroughly considered the evidence and the arguments of counsel, the Court rejects Claimant's contentions and finds that the decision of the Commissioner is supported by substantial evidence.

### A.    Consideration of the VA's Disability Finding

First, Claimant argues that the ALJ failed to assign appropriate weight to the VA's June 2008 determination that Claimant was disabled. Emphasizing that the ALJ gave the VA's determination no weight in his decision, Claimant contends that the ALJ

ignored the requirements of Social Security Ruling ("SSR") 06-03p and, therefore, remand is necessary. Contrary to Claimant's contention, a review of the ALJ's decision reveals that the ALJ gave the VA's finding consideration and weight sufficient to satisfy the requirements of SSR 06-03p. Therefore, this claim is without merit.

20 CFR § 404.1504 explains the role that decisions by other governmental and nongovernmental agencies play in the SSA's disability determination process:

> [a] decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency [e.g., Workers' Compensation, the Department of Veterans Affairs, or an insurance company] that you are disabled or blind is not binding on us.

SSR 06-03p, which sets forth the SSA's interpretation of 20 CFR § 404.1504, provides:

> Under sections 221 and 1633 of the Act, only a State agency or the Commissioner can make a determination based on Social Security law that you are blind or disabled. Our regulations at 20 CFR 404.1527(e) and 416.927(e) make clear that the final responsibility for deciding certain issues, such as whether you are disabled, is reserved to the Commissioner (see also SSR 96-5p, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner"). *However, we are required to evaluate all the evidence in the case record that may have a bearing on our determination or decision of disability, including decisions by other governmental and nongovernmental agencies (20 CFR 404.1512(b)(5) and 416.912(b)(5)). Therefore, evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered.*

(emphasis added); *see also DeLoatche v. Heckler*, 715 F.2d 148, 150 n. 1 (4th Cir. 1983) ("[T]he determination of another governmental entity [is not] binding on the Secretary."); Memorandum, Social Security Administration Office of Hearings and Appeals (Oct. 2, 1992), at 3 (reminding "all ALJs and decision writers that even though another agency's determination that a claimant is disabled is not binding on the SSA ... the ALJ must evaluate it as any other piece of evidence, *and address it in the decision.*")

(emphasis added). Disability decisions made by governmental or nongovernmental agencies "may provide insight into the individual's mental and physical impairment(s) and show the degree of disability determined by these agencies based on their rules." SSR 06-03p. Ultimately, the SSA is not bound by the disability decisions of other governmental and nongovernmental agencies "because other agencies may apply different rules and standards than [the SSA does] for determining whether an individual is disabled[.]" *Id.*

Here, the VA found that Claimant was disabled under Title 38 of the United States Code – Pensions, Bonuses and Veterans' Relief, providing the following rationale for its finding:

> This is a de novo review of the issue of entitlement to nonservice-connected disability pension benefits. We note that you [Claimant] are 50 years old, have a level of education reported as completion of GED, and that you last worked in June 2005 as a Security Guard. The evidence shows you are disabled due to your disabilities of major depressive disorder, Type II diabetes mellitus, and hypertension. These combined disabilities do not meet the scheduler requirements of a single disability ratable at 60 percent or more, or two or more disabilities combining to 70 percent with at least one ratable at 40 percent. However, considering the level of disability and other factors, such as the veteran's age, education and occupational background, extraschedular entitlement to nonservice-connected pension is granted . . . .

(Tr. at 369). In reaching its decision, the VA considered treatment reports supplied by the VAMC for the period between August 27, 2007 and April 28, 2008. (Tr. at 368). Claimant presented the VA's disability determination and supporting treatment reports to the SSA as exhibits prior to Claimant's administrative hearing. (Tr. at 17).

In determining Claimant's RFC and reaching the conclusion that Claimant was not disabled, the ALJ reviewed all of the objective medical evidence, other evidence, and opinion evidence as required by the Social Security regulations and SSR policy

interpretations, including the VA's decision and supporting records. (Tr. at 16–19). In his written decision, the ALJ explicitly addressed the VA's contrary determination and explained the weight he assigned to it, stating:

> [O]n June 5, 2008, the Department of Veterans Affairs found that considering the level of disability and other factors, such as the veteran's age, education and occupational background, extraschedular entitlement to nonservice-connected pension was granted. *The undersigned finds that this was based on different standards and different pressures on the Veterans Administration to help veterans. Therefore, the undersigned gives this little weight when establishing the claimant's residual functional capacity.*

(Tr. at 17) (emphasis added). This explanation is consistent with SSR 06-03p's requirement that "evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered." However, as implicitly recognized by the ALJ, a determination made by the VA that a veteran is disabled under its rules is not binding on the SSA and may be based upon entirely different criteria and concerns. *See* 20 CFR § 404.1504; *see also Hunt v. Astrue*, 242 Fed. Appx. 376, 377 (8th Cir. 2007) (recognizing that disability determinations by the Veterans Administration are not binding on the Social Security Administration); *Jenkins v. Chater*, 76 F.3d 231, 233 (8th Cir. 1996) (holding that a disability determination by the VA is not binding on an ALJ considering a Social Security applicant's claim for disability benefits.). When comparing the standards for establishing disability promulgated by the SSA to the less exacting standards employed by the VA, the ALJ's decision to give "little weight" to the VA's determination is entirely reasonable. (Tr. at 17).

Under the Social Security regulations, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which

can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Thus, the more fully a determination by the VA satisfies this definition of disability, the more evidentiary weight it should be afforded in an ALJ's analysis.  In the present case, nothing in the medical records or the VA's decision itself supports the conclusion that the VA intended the same definition of disability as the SSA. The VA looked only at eight months of medical records. While these records verify Claimant's treatment for depression and anxiety, they also establish that his diagnosis was a single moderate episode of Major Depressive Disorder. (Tr. at 306). Treatment notes reflect that Claimant had sufficient energy for his desired daily activities and had no functional impairments or ambulatory limitations. (Tr. at 301). His thought process, cognitive functions, perception, and intelligence were all found to be within normal limits. (Tr. at 302). Similarly, throughout the relevant time period, Claimant repeatedly complained of a burning sensation in his foot. Multiple healthcare professionals conducted diabetic foot exams of Claimant; yet all found that Claimant's sensation and pulses were normal despite callusing of Claimant's feet and that Claimant's foot was not at risk for complications due to diabetes. No treating source noted anything more serious than minimal swelling of Claimant's feet. Further, despite Claimant's history of hypertension and elevated cholesterol, Claimant's treating physicians unanimously confirmed that Claimant's blood pressure and cholesterol levels were adequately controlled by medication. No treating or examining source found Claimant incapable of sitting, walking, or standing during this time period. No treating or examining source found that Claimant's impairments appreciably affected his daily activities or his ability to engage in personal care. Significantly, no treating source suggested that Claimant was incapable of working or engaging in substantial gainful activity. In truth, the VA

30

conceded that the functional severity of Claimant's disabilities did not meet the VA's own scheduled criteria for benefits and explained that Claimant was being awarded an "extraschedular" pension based upon considerations unrelated to his mental and physical ability to perform basic work activities. The VA did not find that Claimant was unable to engage in substantial gainful activity for a continuous period in excess of one year. Instead, the VA relied heavily upon Claimant's age, education, and occupational background to substantiate his entitlement to benefits, rather than on the severity, persistence, and impact of his physical and mental impairments on his ability to work. In short, the VA's determination clearly was not reached using the definition of disability set forth in 42 U.S.C. § 423(d)(1)(A), but rather was a balancing of equities to achieve the particular goals of the VA. (Tr. at 369). The VA's decisional process in the present case simply was not consistent with the stringent standards required by the Social Security regulations.

In contrast to the VA, the ALJ reached his decision by following the five step sequential process required by the Social Security regulations. Under that process, the ALJ determined the severity of Claimant's impairments, his residual function-by-function capacity, and his ability to perform past relevant work before considering how Claimant's age, education, and occupational background might influence his ability to engage in substantial gainful activity. Although Claimant did not present a *prima facie* case of disability that triggered a step five analysis, the ALJ nonetheless proceeded to that step. To determine whether jobs existed that Claimant could perform in spite of his limitations and view of his individual characteristics (age, education, work experience), the ALJ relied upon the expertise of a vocational specialist, who confirmed both the existence and availability of such jobs in substantial numbers in the national and

regional economy.

In summary, the ALJ properly considered the VA's disability finding, the differences between the disability standards of the two agencies, the seemingly inadequate foundation for the VA's ultimate decision, and the objective medical evidence, reaching the conclusion that Claimant was not disabled under the Social Security Act.  The ALJ analyzed the identical evidence[3] considered by the VA in making it disability determination, but also took into account treatment records that predated and postdated those reviewed by the VA, the testimony of Claimant, and RFC and PRT assessments prepared by multiple state agency consultants. (Tr. at 13–19). With a broader and slightly different perspective, the ALJ assigned the VA's decision the weight to which it was entitled within the decisional framework of Social Security disability claims. Accordingly, the ALJ's decision to accord the VA's disability finding "little weight" in his own disability analysis was appropriate under the circumstances and supported by substantial evidence.

**B.**    **Consideration of the Evidentiary Record**

Next, Claimant argues that the ALJ selected and discussed only parts of the evidentiary record that supported his ultimate conclusion that Claimant was not disabled. Citing *Hines v. Barnhart*'s admonition that "[a]n ALJ may not select and discuss only that evidence that favors his ultimate conclusion[,]" 453 F.3d 559, 566 (4th Cir. 2006) (quoting *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995)), Claimant points to a laundry list of medical reports that purportedly contradict the ALJ's conclusion, which Claimant argues should have been discussed by the ALJ in his opinion. After reviewing

---

[3] The VA considered Claimant's treatment records from the Huntington Veterans Affairs Medical Center from the period between August 27, 2007 and April 28, 2008. (Tr. at 368). These same records were included as exhibits for the ALJ to consider in making a disability determination. (Tr. at 285–315).

the ALJ's opinion, the Court is satisfied that the ALJ thoroughly examined and reviewed all of the available evidence as required by the regulations. Therefore, the Court finds this claim to be unpersuasive.

The Social Security Act requires the ALJ to consider all evidence submitted on behalf of a claimant. *See* 20 C.F.R. § 404.1520(a)(3) ("We [the SSA] will consider all evidence in your case record when we make a determination or decision whether you are disabled."). Where the ALJ "fails to discuss relevant evidence that weighs against his decision," the court will remand for further proceedings. *Ivey v. Barnhart*, 393 F.Supp.2d 387, 390 (E.D.N.C .2005) (citing *Murphy v. Bowen*, 810 F.2d 433, 438 (4th Cir. 1987)); *see also Hines v. Barnhart*, 453 F.3d 559, 566 (4th Cir. 2006) ("An ALJ may not select and discuss only that evidence that favors his ultimate conclusion." (quoting *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995)). Although the ALJ is required to *consider* all of the evidence submitted on behalf of a claimant, "[t]he ALJ is not required to *discuss* all evidence in the record." *Aytch v. Astrue*, 686 F.Supp.2d 590, 602 (E.D.N.C. 2010) (emphasis added); *see also Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (explaining there "is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision"); *Piney Mountain Coal Co. v. Mays*, 176 F.3d 753, 762 n. 10 (4th Cir. 1999) (ALJ need not discuss every piece of evidence in making credibility determination); *Anderson v. Bowen*, 868 F.2d 921, 924 (7th Cir. 1989) (noting "a written evaluation of every piece of testimony and submitted evidence is not required"). Indeed, "[t]o require an ALJ to refer to every physical observation recorded regarding a Social Security claimant in evaluating that claimant's ... alleged condition[s] would create an impracticable standard for agency review, and one out of keeping with the law of this circuit." *White v. Astrue*, 2009 WL 2135081, at *4 (E.D.N.C. July 15,

2009). Ultimately, an ALJ must indicate the weight given to all relevant evidence so that a reviewing court may determine if the ALJ's decision is supported by substantial evidence. *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984).

### 1.    *Blood Pressure Records*

First, Claimant contends that the ALJ failed to discuss Claimant's testimony regarding his persistent hypertension and its effects when evaluating the severity of that alleged impairment, arguing:

> [Claimant] testified that he was taking four different blood pressure pills. The evidence supports that he was taking Nifedipine, 30 mg, 1 time a day; Metropolol 100 mg, 2 times a day; Lisinopril 40 mg, 1 time a day and Hydrochlorothiazide, 25 mg, 1 time a day for fluid and blood pressure. In addition [Claimant] stated in his Appeal to the initial denial he said that he can tell when his blood pressure goes up because he gets very dizzy and light headed. Anything physical causes it to shoot up, and he has to sit down when this happen. When it came to squatting, bending, and climbing stairs, his blood pressure would increase and he would get light headed. He didn't do any yard work because his blood pressure would get too high.

(Pl.'s Br. at 12) (citations omitted). Despite Claimant's contention to the contrary, the ALJ explicitly discussed Claimant's medication intake and the physical consequences of Claimant's high blood pressure at length in his opinion. (Tr. at 13). After reviewing Claimant's testimony regarding the effects of his hypertension, the ALJ observed that Claimant's blood pressure readings had been stable for an extended period of time and he showed no signs or symptoms of end organ damage caused by persistent hypertension. (*Id.*). Therefore, the ALJ concluded that Claimant's blood pressure was not a severe impairment. (*Id.*).

To the extent that the ALJ failed to expressly calculate and explain the weight he gave to Claimant's testimony, the Court finds this to be harmless error. Courts have applied a harmless error analysis to administrative decisions that do not fully comport

with the procedural requirements of the agency's regulations, but for which remand "would be merely a waste of time and money." *Jenkins v. Astrue,* 2009 WL 1010870 at *4 (D. Kan. Apr. 14, 2009) (citing *Kerner v. Celebrezze,* 340 F.2d 736, 740 (2nd Cir. 1965)). In general, remand of a procedurally deficient decision is not necessary "absent a showing that the [complainant] has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Connor v. United States Civil Service Commission,* 721 F.2d 1054, 1056 (6th Cir. 1983). "[P]rocedural improprieties alleged by [a claimant] will therefore constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). The Fourth Circuit has similarly applied the harmless error analysis in the context of Social Security disability determinations. *See Morgan v. Barnhart,* 142 Fed. Appx. 716, 722–23 (4th Cir. 2005) (unpublished); *Bishop v. Barnhart,* 78 Fed. Appx. 265, 268 (4th Cir. 2003) (unpublished).

The ALJ's failure to state precisely the weight he accorded Claimant's testimony does not cast doubt upon the existence of substantial evidence to support the ALJ's decision. The evidentiary record, other than Claimant's own testimony, reveals no limitations on Claimant's ability to engage in substantial gainful activity as a result of Claimant's blood pressure. Claimant's treating physician during the relevant time period described Claimant's blood pressure as adequately controlled with medication. In fact, following Claimant's alleged date of disability onset, Claimant's blood pressure continued to decrease with continued treatment. During the relevant time period, no treating source or state agency physician found that Claimant was unable to work as a result of his blood pressure. All three state agency physicians that reviewed Claimant's

physical capabilities found that he was capable of medium level work. The ALJ acknowledged Claimant's testimony and implicitly discounted it in the face of contradictory evidence. The ALJ's failure to more fully discuss his analysis did not prejudice Claimant, because the ALJ's rationale is clear in the context of his written decision and is supported by substantial evidence. Consequently, remand on this ground would be nothing more than a waste of time and money.

### 2.    *Evidence Related to Social Functioning*

Next, Claimant argues that the ALJ failed to properly consider and discuss records related to Claimant's social functioning. Specifically, Claimant contends that the ALJ ignored evidence of Claimant's inability to get along with residents and staff at the Veterans Home. According to Claimant:

> The ALJ did not mention [that Claimant] stated in his application, He state [sic] he really disliked living in proximity to people at the Veteran's Home in Barboursville, West Virginia. [Claimant's] mother also reported he had been depressed for a long time and that living in the Veteran's Home made it worse. He reported problems getting along with the other residents at the Veteran's Home and he had no interest in social activities any more [sic]. In August 2007 he hit a wall and was verbally aggressive with others 3 to 4 times a week.

(Pl.'s Br. at 13) (citations omitted). In his written decision, the ALJ described Claimant's struggle with depression and anxiety (Tr. at 14); evaluated Claimant's social functioning (Tr. at 15); and concluded that Claimant had only mild limitations in social functioning.

Claimant is correct in observing that the ALJ did not discuss at length Claimant's self-professed problems in getting along with others at the Veterans Home. However, the ALJ noted that Claimant experienced "panicky" feelings around other residents at the Home and thought they were talking about him. (Tr. at 14). The ALJ listened carefully to Claimant's testimony related to his living arrangements and his past work

history as a security guard. The ALJ emphasized that despite some statements to the contrary, Claimant admitted at the hearing that he had "no trouble socializing." (Tr. at 15, 39–40). Moreover, Claimant reported spending considerable time with his family members, regularly checking on his elderly parents and disabled brother and visiting his sons and grandchildren at least once or twice each week. (Tr. at 17). Consequently, the ALJ determined that Claimant had only a mild limitation in social functioning.

Any failure on the part of the ALJ to more clearly explain the weight he gave to Claimant's testimony about sporadic episodes of anxiety and irritability he felt at the Veterans Home was harmless error. As previously noted, "[t]he ALJ is not required to *discuss* all evidence in the record" as long as the ALJ's finding is sufficiently clear to allow for adequate judicial review and is supported by substantial evidence. *Aytch v. Astrue*, 686 F.Supp.2d 590, 602 (E.D.N.C. 2010). The evidentiary record contains numerous medical findings and other evidence verifying that Claimant's social functioning was either not affected or only mildly affected by his depression. Starting with his own testimony at the administrative hearing, Claimant admitted that he had no trouble socializing and his medication was helpful in controlling his depression and irritability. Multiple treating sources diagnosed Claimant as suffering from a single moderate episode of Major Depressive Disorder. No treating source or state agency expert found that Claimant's daily activities were substantially limited as a consequence of his depression and irritability. Three state agency mental health experts reviewed Claimant's medical history; all three found that Claimant suffered only mild limitations in social functioning, was not disabled because of his mental impairments, and was capable of performing substantial gainful activity. In light of this substantial evidence,

Claimant's argument is without merit. [4]

### C.   <u>Severity of Impairments</u>

Claimant challenges the ALJ's finding that Claimant's hypertension and depression were not severe impairments and did not significantly limit his ability to engage in basic work activities. Pointing to his treatment by numerous physicians, Claimant contends that the objective medical evidence supports the conclusion that these impairments significantly affected his ability to engage in work-related functions. In fact, this argument finds little corroboration in the record. To the contrary, the record substantiates the ALJ's conclusion that Claimant's blood pressure and depression were not severe impairments.

Social Security Regulations provide the basic definition of disability as:

the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. To meet this definition, you must have a severe impairment(s) that makes you unable to do your past relevant work (*see* § 404.1560(b)) or any other substantial gainful work that exists in the national economy.

20 C.F.R. § 404.1505(a). Under the five step sequential evaluation process for the adjudication of disability claims, if the claimant is not currently engaged in substantial gainful employment, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* at § 404.1520(c). A "severe" impairment is an impairment or combination of impairments that significantly limits a claimant's

---

[4] Claimant briefly argues that the ALJ failed to discuss Dr. Frederick's finding that Claimant's intellectual functioning appeared to be in the borderline range. (Pl.'s Br. at 13). It appears that Claimant contends that the case should be remanded in part due to this failure. However, Claimant makes no argument as to why the ALJ should have explicitly discussed this finding. As Respondent aptly notes, Claimant did not allege that he was disabled due to diminished intellectual capacity and the record does not support such a finding. No other health care expert made a similar observation. Therefore, an explicit discussion of Claimant's intellectual capacity would not have been relevant to the claims presented by Claimant.

physical or mental ability to do basic work activities. *Id.* at § 404.1521(a). "Basic work activities"[5] refers to "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). "[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p (citing SSR 85-28); *see also Albright v. Commissioner of Social Sec. Admin.*, 174 F.3d 473, 478 n. 1 (4th Cir. 1999) (citing *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984)). "A determination that an individual's impairment(s) is not severe requires a careful evaluation of the medical findings that describe the impairment(s) (i.e., the objective medical evidence and any impairment-related symptoms), and an informed judgment about the limitations and restrictions the impairment(s) and related symptom(s) impose on the individual's physical and mental ability to do basic work activities." SSR 96-3p (citing SSR 96-7p).

In determining that Claimant's hypertension and depression were not severe impairments, the ALJ made a careful evaluation of the medical findings and a reasoned judgment regarding the limitations that arose from the existence and treatment of those conditions. With respect to Claimant's blood pressure, the ALJ reviewed Claimant's medication intake and the physical consequences of Claimant's high blood pressure. (Tr. at 13). The ALJ discussed Claimant's testimony and compared it with the available objective medical evidence. (*Id.*). Noting that Claimant testified that his medication controlled his blood pressure, the ALJ observed that Claimant's medical records included the opinion of Claimant's treating physician that Claimant's blood pressure

---

[5] Examples of "basic work activities" are (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b).

was adequately controlled by medication. (*Id.*). The ALJ emphasized that there was no evidence that Claimant had suffered any end organ damage as a result of his high blood pressure. (*Id.*). Therefore, the ALJ concluded that Claimant's blood pressure was not a severe impairment. (*Id.*).

Turning next to the ALJ's assessment of Claimant's depression, over a page of the ALJ's opinion is devoted to an analysis of the severity and effects of Claimant's mental impairments. (Tr. at 14–15). The ALJ reviewed Claimant's mental health treatment history. (Tr. at 14). He noted that Claimant reported suffering periodically from trouble sleeping, loss of energy, fatigue and trouble with concentration and was diagnosed as suffering from Major Depressive Disorder. However, the ALJ observed that the results of Claimant's mental status examinations were otherwise within normal limits. (*Id.*). Following a review of Claimant's alcohol use, the ALJ studied the four broad functional areas set out in 20 C.F.R. § 404.1520a(c) and compared Claimant's findings and symptoms to the severity criteria therein. (Tr. at 14–15). The ALJ found that Claimant had no limitation on his activities of daily living. (Tr. at 15). Claimant testified that he performed personal care, watched television, performed chores, did the laundry, and read magazines. (*Id.*). The ALJ then found that Claimant had a mild limitation in social functioning. (*Id.*). Claimant reported that he did not attend church or social groups but that he visited with family frequently and talked to them on the phone. (*Id.*). The ALJ evaluated Claimant's concentration, persistence, and pace, and concluded that Claimant was subject to mild limitations in this functional area as well. (*Id.*). Claimant regularly drove his car, paid bills, counted change, handled his savings account, and used a checkbook. (*Id.*). Finally, the ALJ considered whether Claimant had suffered any episodes of decompensation and found that Claimant had not experienced any periods

of extended duration. (Tr. at 15). The ALJ then stated, "[b]ecause [Claimant's] medically determinable mental impairments cause no more than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation which have been of extended duration in the fourth area, they are nonsevere." (*Id.*).

The ALJ's finding that Claimant's hypertension and depression were not severe impairments was supported by substantial evidence. The evidentiary record, other than Claimant's own testimony, reveals no limitations on Claimant's ability to engage in basic work activities as a consequence of Claimant's hypertension. Claimant's treating physician during the relevant time period described Claimant's blood pressure as adequately controlled by medication. Also during the relevant time period, no treating source or state agency consultant found that Claimant was unable to: (1) walk, stand, lift, push, pull, reach, carry, or handle; (2) see, hear, or speak; (3) understand, carry out, and remember simple instructions; (4) use appropriate judgment; (5) respond appropriately to supervision, co-workers and usual work situations; or (6) deal with changes in a routine work setting as a result of his high blood pressure. *See* 20 C.F.R. § 404.1521(b) (defining basic work activities). All three state agency physicians that reviewed Claimant's physical capabilities found that he was capable of medium level work despite his blood pressure and other impairments.

Moreover, no treating source or state agency physician found that Claimant was unable to: 1) walk, stand, lift, push, pull, reach, carry, or handle; 2) see, hear, or speak; 3) understand, carry out, and remember simple instructions; (4) use appropriate judgment; (5) respond appropriately to supervision, co-workers and usual work situations; or (6) deal with changes in a routine work setting as a consequence of his depression. *See* 20 C.F.R. § 404.1521(b). Multiple mental health professionals found

that Claimant's social functioning was not affected or only mildly affected by his depression. Claimant's treating sources diagnosed him as suffering from a single moderate episode of Major Depressive Disorder. Three state agency mental health experts reviewed Claimant's medical history; all three found that Claimant suffered from mild limitations in social functioning. Claimant reported performing personal care, driving, doing the laundry, managing his finances, watching television, interacting with staff and family without problems. Claimant's attitude, perception, memory, and concentration were all determined to be within normal limits. Claimant confirmed that he had no difficulty socializing and agreed that his medication was helpful in controlling his depression and irritability. Nothing in the record suggests that Claimant was incapable of performing basic work activities. Therefore, the Court finds that the ALJ assessment of Claimant's hypertension and depression was proper and his conclusion was supported by substantial evidence.

**D.    Credibility Finding**

Finally, Claimant contends that the ALJ's credibility finding was improper because the ALJ failed to consider the various factors set forth in SSR 96-7p. (Pl.'s Br. at 14). In support of this argument, Claimant cites the Commissioner's warning that:

> [i]t is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p. Although Claimant does not elaborate on this argument beyond quoting a paragraph of SSR 96-7p, the Court understands Claimant to take issue with the ALJ's paragraph directly addressing Claimant's credibility:

> In determining [Claimant's] residual functional capacity, the undersigned has considered and made reductions based upon [Claimant's] demeanor as a witness. The undersigned was able to observe [Claimant] while he testified, his demeanor, the way he answered the questions and all of the other factors that go into assessing a witness' credibility. Considering these factors, the undersigned finds [Claimant's] credibility as a witness to be poor and his demeanor during the hearing consistent with the limitations established in his residual functional capacity.

(Tr. at 17).   Presumably, Claimant argues that this paragraph is a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible[,]" which is prohibited by SSR 96-7p. When read in isolation, this paragraph is indeed conclusory in nature. However, a reading of this paragraph in the context of the ALJ's full written decision confirms that in making the credibility determination, the ALJ thoroughly reviewed Claimant's testimony and compared it with the objective medical evidence, the ALJ's observations of Claimant at the administrative hearing, and the opinions of Claimant's treating physicians, all of which were in keeping with the directives of SSR 96-7p. Therefore, the Court rejects Claimant's argument.

In evaluating a claimant's credibility, an ALJ will consider all of a claimant's symptoms, including pain, and the extent to which a claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. 20 C.F.R. § 404.1529. SSR 96-7p sets forth the factors that an ALJ should consider in assessing a claimant's credibility, emphasizing the importance of explaining the reasons supporting the credibility determination. Pursuant to SSR 96-7p, an ALJ

must consider the following factors in addition to the objective medical evidence when assessing the credibility of an individual's statements:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-p (citing 20 CFR §§ 404.1529(c), 416.1529(c)).

   In determining a claimant's credibility, an ALJ must take into consideration "all the available evidence," including: the claimant's subjective complaints; claimant's medical history, medical signs, and laboratory findings;[6] any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.);[7] and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, the location, duration, frequency and intensity of symptoms; precipitating and aggravating factors; any medical treatment taken to alleviate it; and other factors relating to

---

[6] *See* 20 C.F.R. § 404.1529(c)(1).

[7] *See* 20 C.F.R. § 404.1529(c)(2).

44

functional limitations and restrictions.[8] *Craig v. Cather*, 76 F.3d 585, 595 (4th Cir. 1996). An ALJ's credibility finding:

> must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

SSR. 96-7p.

When considering whether an ALJ's credibility determinations are supported by substantial evidence, the Court is not charged with simply replacing its own credibility assessments for those of the ALJ; rather, the Court must review the evidence to determine if it is sufficient to support the ALJ's conclusions. "In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence ... or substitute its own judgment for that of the Commissioner." *Hays v. Sullivan,* 907 F.2d. 1453, 1456 (4th Cir. 1990). Ultimately, credibility determinations as to a claimant's testimony regarding his or her limitations are for the ALJ to make. *Shively v. Heckler*, 739 F.2d 987, 989–90 (4th Cir. 1984). Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively*, 739 F.2d at 989–90 (citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976)).

Here, the ALJ complied with the requirements of 20 C.F.R. § 404.1529 and SSR

---

[8] *See* 20 C.F.R. § 404.1529(c)(3).

96-7p in making a credibility determination. The ALJ analyzed throughout the written decision Claimant's testimony regarding his diabetes, swelling in his feet and ankles, blood pressure, cholesterol, depression, and social functioning. (Tr. at 13–17). Claimant testified that he took a variety of medications for his blood pressure; he got lightheaded frequently as a result of his diabetes; his ankles and feet swelled up because of his diabetes; he was unable to walk more than 10 or 15 minutes at a time because of the swelling in his feet and ankles; his legs and feet burned and cause him to be unable to sleep; his diabetes had caused his vision to deteriorate; his right wrist ached all of the time; and that he suffered from severe depression that resulted in loss of energy, being unable to sleep, and irritability that prevented him from functioning in a work environment (*Id.*). The ALJ addressed each of these claims in detail, finding that much of Claimant's testimony was simply unsupported by the objective medical evidence, including the records of Claimant's own treating physicians, and Claimant's daily activites. (*Id.*).

The ALJ addressed Claimant's testimony regarding his blood pressure and discussed Claimant's long history of treatment for hypertension. Claimant alleged that his high blood pressure prevented him from engaging in physical exertion and made it difficult for him to walk or stand for anything more than 10-15 minutes. Noting that Claimant took four separate medications to control his blood pressure, the ALJ emphasized that Claimant's treating physician found Claimant's blood pressure to be satisfactorily controlled by medication. (Tr. at 13). The record contained no evidence of end organ damage or any other support for Claimant's position that his blood pressure prevented him from working. (*Id.*). Claimant also testified of a constant pain in his right wrist, but the ALJ observed that there simply was no evidence in the medical record of

46

treatment for his right wrist. (Tr. at 13–14).

In addressing Claimant's testimony regarding his mental health and social functioning, the ALJ recognized that Claimant had sought treatment for depression and took antidepressants. (Tr. at 14). Although Claimant argued that his depression and irritability made him unable to function in a work setting, the ALJ reviewed Claimant's treatment records and cited evidence that Claimant's thoughts were clear and goal-oriented, his insight was fair, and his judgment within normal limits. (*Id.*). Claimant was consistently diagnosed as suffering from a single episode of moderate Major Depressive Disorder. (*Id.*). The ALJ noted that nothing in the record suggested that Claimant was unable to perform basic work activities because of his mental impairments. (*Id.*). The ALJ observed that Claimant was able to care for his own personal needs, perform basic chores, visit with family, drive a car, manage his finances, and watch television. (Tr. at 15).

With respect to Claimant's diabetes and resulting foot and ankle problems, the ALJ noted that Claimant had not been prescribed shoes, a cane, or special socks or stockings for his ankles and feet swelling. (Tr. at 16). Despite Claimant's claims of significant pain and swelling in his feet, the ALJ found that all medical examinations had revealed "minimal" swelling of the feet (*Id.*). Claimant's foot sensation and pulses were normal upon examination and treating sources found that Claimant's feet were not at risk for complications from diabetes. (Tr. at 17). In response to Claimant's testimony that his vision had deteriorated due to his diabetes, the ALJ observed that Claimant did not wear prescription glasses. (Tr. at 16). Further, although Claimant complained that he was unable to work, the ALJ noted that Claimant requested vocational assistance to return to the work force following the alleged disability onset date. (Tr. at 17).

The ALJ properly considered Claimant's testimony and reviewed the objective medical evidence, including treatment records and the reports of state agency medical consultants, in determining Claimant's credibility. At the administrative hearing, Claimant complained of a litany of physical and mental impairments that allegedly prevented him from engaging in substantial gainful activity. However, very little was found in the record to corroborate Claimant's descriptions of the persistence, severity and intensity of his alleged disabilities. Claimant was examined by a variety of treating sources and his records were studied by multiple state agency physicians, including doctors, nurses, and mental health care professionals. None of these individuals found that Claimant was incapable of engaging in substantial gainful activity; none suggested that Claimant was disabled; none found extreme exertional or nonexertional functional limitations. Claimant's treating physician found that Claimant's hypertension and cholesterol were well controlled by medication. Multiple examinations of Claimant's feet were conducted, all of which revealed minimal swelling of the feet and ankles with no diabetic complications. Three mental professionals examined Claimant at the request of the SSA, none of whom found that Claimant was disabled as a result of his depression. Three state agency physicians reviewed Claimant's medical records and found that Claimant was capable of performing medium work with minimal environmental and postural limitations. No treating source or state agency physician found that Claimant was unable to walk, stand, sit, lift, or carry items. In short, no evidence corroborates Claimant's testimony that he unable to work for a continuous period of time in excess of one year. To the contrary, the vast majority of the evidence suggests that Claimant was capable of performing basic work functions and was not disabled under the Social Security Act. Having thoroughly reviewed the record, it is clear to the Court that the

ALJ's credibility finding is supported by substantial evidence.

**VIII.** <u>**Conclusion**</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to the Plaintiff and counsel of record.

**ENTERED**: January 10, 2012.

Cheryl A. Eifert
United States Magistrate Judge